**ROLLINS v. HELVERING, Commissioner of Internal Revenue (five cases).\***

**Nos. 10805–10809.**

Circuit Court of Appeals, Eighth Circuit.

Oct. 5, 1937.

Rehearing Denied Oct. 29, 1937.

J. G. Gamble, of Des Moines, Iowa (J. F. Rosenfield and Gamble, Read & Howland, all of Des Moines, Iowa, on the brief), for petitioners.

John J. Pringle, Jr., Sp. Asst. to Atty. Gen. (James W. Morris, Asst. Atty. Gen., and Sewall Key and Norman D. Keller, Sp. Assts. to Atty. Gen., on the brief), for respondent.

Before STONE, SANBORN, and THOMAS, Circuit Judges.

STONE, Circuit Judge.

These are five individual petitions to review separate redeterminations, by the Board of Tax Appeals, of the respective personal income taxes for 1929 of Harry T. Rollins, Glendora M. Rollins, Margaret C. Rollins, Ellen F. Rollins, and Ralph E. Rollins.

The facts are undisputed. Ellen F. Rollins is the mother of Harry T. and Ralph E. Rollins; Glendora M. Rollins is the wife of Harry T. Rollins, and Margaret C. Rollins is the wife of Ralph E. Rollins. On January 1, 1929, petitioners were the owners, in different amounts, of all but two of the corporate shares of the Rollins Hosiery Company. February 13, 1929, an option to purchase all of this stock was given. On July 19, 1929, this option passed into a "memorandum of agreement" of sale —differing from the option in respects not here important. The memorandum provided that, not later than August 15, 1929, and upon three days notice, the stock would be delivered against the purchase price.

On August 3, 1929, each of the petitioners created certain separate trusts wherein the corpus of each was designated shares of the above stock then owned by the grantor—there were 26 of the trusts in all.[1] So far as here material, the provisions of the various trust instruments are identical. The trustee in all was the City Bank Farmers' Trust Company. The beneficiaries in each were the grantor and either the husband or wife or child or grandchild.

One provision required the trustee to sell "any of the trust property" upon the direction of Harry T. Rollins and "in such manner" as he might direct. On August

[1] On July 24, 1929, each of two of the petitioners created a trust covering some of the above stock but those trusts are not here involved.

8, 1929, the stock passed to the trustee under all of the above 26 trusts, and on the same day the trustee received the required direction to sell to the purchaser under the above memorandum agreement of sale. The trustee sold the stock and collected and holds the proceeds under the trust agreements. Such sales were for more than the cost of the stock to the respective grantors. It is these profits which the Commissioner claims and the Board found to be taxable to the respective grantors as individual capital gains. Petitioners contend that any gains were taxable to the trustee under each of the separate trusts and not to the grantors as individuals.

There being no dispute as to facts, the question here is purely one of law. The situation is that the trustee had legal title to the stock at the time of sale; that it sold the stock in accordance with the trust instruments; that it holds the proceeds of the sales in accordance with such instruments; and that none of the grantors received any part of these proceeds.

If the grantors are individually subject to taxation for gains from these sales, it must be because the transactions fall within section 167 of the Revenue Act of 1928 (45 Stat. 791, 840 [26 U.S.C.A. § 167 note]). So far as material here, that section is: "Where any part of the income of a trust may, in the discretion of the grantor of the trust, either alone or in conjunction with any person not a beneficiary of the trust, be distributed to the grantor or be held or accumulated for future distribution to him, * * * such part of the income of the trust shall be included in computing the net income of the grantor."

Petitioners contend that the above-quoted provision is not here applicable for two reasons: First, that these capital gains never were distributable income because each of the trust instruments expressly required that "all profits realized from the sale of any part of the trust corpus shall be considered as principal"; and, second, that no discretion was vested in the respective grantors to have such gains paid to them during the tax year 1929.

### 1. Capital Gains.

The contention that these capital gains are not taxable income to the grantors because the trust instruments expressly treat such as not distributable to the beneficiaries is not conclusive. The taxing statutes are (within constitutional limits) determinative of what is taxable gain and when and to whom it is taxable. Here, there is no dispute as to the existence of a taxable capital gain. The statement in the instruments that such profits "shall be considered as principal" has no effect upon the fact that they are actually profits, and therefore no effect upon the legal situation that such profits are subject to taxation to someone. The effect of such a provision is upon the *distribution* of what is gain and, therethrough, upon the particular person liable for the tax thereon.

Generally speaking, parties can, by genuine contracts, establish legal relations which may result in locating tax liability. However, if such contracts leave any power of enjoyment of gains (in their nature taxable) in any person, the constitutional power exists in the Congress to tax such gain to that person. DuPont v. Commissioner, 289 U.S. 685, 689, 53 S.Ct. 766, 767, 77 L.Ed. 1447; Burnet v. Wells, 289 U.S. 670, 678, 53 S.Ct. 761, 764, 77 L. Ed. 1439; Reinecke v. Smith, 289 U.S. 172, 177, 178, 53 S.Ct. 570, 572, 573, 77 L.Ed. 1109; Corliss v. Bowers, 281 U.S. 376, 378, 50 S.Ct. 336, 74 L.Ed. 916. If these instruments had no other pertinent provisions relating to power over these gains by the grantors or if Congress had not used its constitutional authority to tax the grantor for gains of trusts created by him, this provision in these trust instruments as to sales profits being principal might well be controlling. However, there are other provisions in the instruments which require examination in connection with such congressional action. Thus, while giving full force to the provision as to sales profits being treated as principal, we cannot rule these cases upon that point alone, but must consider the other pertinent provisions of the instruments in relation to the application of section 167 to them.

### 2. Discretion in Grantors.

Section 167 provides that "Where any part of the income of a trust may, in the discretion of the grantor of the trust, either alone or in conjunction with any person not a beneficiary of the trust, be distributed to the grantor, * * * such part of the income of the trust shall be included in computing the net income of the grantor." "Income," as used in this section, means income as defined in that act and, therefore, includes these capital gains. "Grantor" means the person (who creates the trust) as an individual and not merely when acting as grantor. "Discre-

tion" means a power of choice. The full meaning of the quoted provision is that, when an individual who creates a trust has the power thereunder to distribute any part of the income of such trust to himself, he is taxable for such part as though it were a part of his personal income.

■ Each of these petitioners was a creator of certain of these trusts and these capital gains were incomes of the respective trusts. The inquiry remains as to whether these petitioners had the power to distribute any of such gains to themselves under the terms of the respective trusts created by each of them. The answer must be sought in the trust instruments which set forth the powers of petitioners. In construing such instruments, we accept the definition in the instruments of terms used therein. The instruments define "principal" or trust corpus as including these capital gains—the word "income" in the instruments does not refer to these capital gains. The pertinent trust provisions dealing with disposition of such corpus are as follows:

"2. The trustee may from time to time apply to the use of myself and my descendants or any of us so much of the principal of the trust as in its discretion it may deem advisable for our proper education, care, comfort and support."

"8. After January 1st, 1930, I reserve the right, from time to time, by an instrument in writing delivered to the trustee, to amend or revoke this agreement, in whole or in part, and to change any beneficial interest hereunder; provided, however, that I shall not have the power at any time during any taxable year within the meaning of the revenue laws of the United States to revest in myself title to any part of the corpus of the trust, except upon written notice delivered to the trustee during the preceding taxable year, or except with the written consent of the beneficiary, other than myself, currently entitled to the distributable income of the trust or of such share thereof as may be affected thereby. * * *

"11. * * * I reserve the right at any time to require the resignation of any trustee at any time acting hereunder and to appoint a successor trustee. * * *"

Paragraph 8, above quoted, contains no power to distribute any of these capital gains to petitioners during the year 1929. It defines the power of revocation or amendment of the trust by the grantor as

such; and, purely as a limitation upon that power, prohibits the grantor from exercising such for the purpose of "revesting" in himself any part of the corpus except by giving written notice to the trustee during the preceding tax year (under United States tax statutes) or by obtaining the written consent of the other beneficiary. This limitation on the power of the grantor to revoke or amend is not intended as, nor is it, a limitation upon the trustee in the exercise of the powers given him under other provisions of the instruments nor upon the power of any beneficiary to receive.

Paragraph 11 quoted gave full power to the grantor to replace the named trustee with himself during the tax year 1929, since the right was reserved to require the resignation of the named trustee "at any time" and to appoint a successor.

Paragraph 2 quoted gave the trustee power at any time—during 1929 as well as later—to apply to the use of the petitioner, as a beneficiary, "so much of the principal of the trust as in its discretion it may deem advisable for our proper education, care, comfort and support."

■ Taking together the power of each petitioner (under paragraph 11) to constitute himself trustee during 1929 and the power, as such trustee, to pay out these capital gains—as part of the corpus—to himself as beneficiary in 1929, it is clear that a "discretion" existed under section 167 to distribute to himself in 1929 or to hold for future distribution to him these gains unless the discretion allowed the trustee is so limited as to prevent this.

Petitioners argue that it is so limited. They say that the discretion allowed the trustee in paragraph 2 is confined to such payments as are reasonable for the "proper education, care, comfort and support" of the beneficiary (petitioner); that this record shows that each of these petitioners had a large and ample income in 1929 aside from the trusts, and, therefore, there could exist no legal basis for the exercise of this discretion of the trustee; and that for the trustee to pay out these gains under the above power in this situation would be a fraud upon the other beneficiary.

■ There is much that is plausible in these arguments. As a general rule of law, we may accept the statement that a discretion lodged in a trustee is rarely, if ever, a permit to act arbitrarily. Usually, such grant of discretion is confined to

the exercise of judgment not unreasonable in the light of the purposes of the trust and of the circumstances in which it is sought to be exercised. A court of equity has power to control the administration of a trust so that it will accord with the purposes of the grantor. This power exists solely for the protection of rights of the grantor who created the trust and of the rights of the beneficiaries of the trust—there is no public interest in the matter where the parties to the instrument are purely private parties.

Let us examine these rights of these grantors (petitioners) and of these beneficiaries in respect to an exercise of this discretion in the trustee to distribute the corpus to these beneficiaries. Suppose any of the petitioners had, in 1929, exercised the power to remove the named trustee and designate himself as such, as permitted under paragraph 11 of the trust instrument. Also, suppose he had then sought to distribute to himself, as one of the beneficiaries, these capital gains under the authority in paragraph 2 of the trust instrument. Obviously, such petitioner would not have violated his own legal rights as grantor or as a beneficiary under the trust instrument nor would nor could he have had any standing in equity to the contrary. The only person who might be injuriously affected by such distribution and entitled to question such action in a court of equity would be the other beneficiary.

Let us examine the situation of the other beneficiary in this contingency. He could invoke the aid of a court of equity to challenge such distribution. Would he ever do so as matter of fact? In short, is this right of this beneficiary a substantial, valuable right or is it one only in theory?

The records before us leave no doubt, and there is scarcely any challenge, that the main, if not the sole, reason for creating these trusts was to avoid United States income taxes on the profits from the sale of this stock—the terms of the trust instruments themselves show the greatest care and ingenuity to accomplish that purpose. The obvious endeavor was to do two things: First, to reduce to the minimum the income tax on these capital gains by dividing and directing them into various trusts; and, second, to retain full practical control over the entire sales proceeds to the respective owners of the stock sold. The sale was a certainty at the time the trust instruments were executed. These gains would occur in August, 1929. The problem was to avoid individual taxation thereon for that year. The taxing statute governing that year was in existence. The instruments were drawn with those statutes and this situation in mind. Yet there must be retained in the stock owners the essential practical control over the situation. In every instance, the grantor was a beneficiary and the other beneficiaries were close family members. The above statements are not made to condemn these efforts to reduce this taxation nor as constituting, in themselves, reasons why these efforts are legally unavailing. They are made to show the background of these transactions and as constituting reasons why this court should go no further to sustain them than it is compelled.

The vital provision bearing upon the situation of the beneficiary other than the grantor is that paragraph 8 of each trust instrument expressly reserved to the grantor the right "After January 1st, 1930 * * * to change any beneficial interest hereunder." Thus the situation was that within five months from the date of the trust instruments the respective grantors had unrestricted power to terminate the interests of any or of all of the other beneficiaries. If one of these other beneficiaries had attempted to oppose in court a distribution in 1929, it is obvious that his entire interest could have been terminated as of January 2, 1930. Should this termination occur, the sole thing remaining in such litigation would have been only the litigant's share (as one of the beneficiaries) of the income, if any, derived or derivable from investment of such capital gains for the short time between the date of such distribution and January 2, 1930. By postponing distribution to himself until the last day of 1929, any grantor could have limited this income of the other beneficiary to not more than two days.

When we consider the relationship between the parties and, far more than that, the above possible effects upon such beneficiaries of this power or threat of early annihilation of practically their entire interests, is it possible sanely to imagine them exercising a right to oppose a distribution of these capital gains—only a lesser portion of the trust corpora—if the petitioners should endeavor to make such distribution to themselves during the remaining five months of 1929? The right of these beneficiaries to resist was and could be nothing more than an empty, harmful shell which

they would be the last to want to occupy. When every motive to normal human conduct convinces that a temporary legal right exists under such conditions that it would not be exercised, we cannot treat that right as an effective bar to a duty enjoined by law. We must be governed by actualities—particularly in tax matters. Burnet v. Wells, 289 U.S. 670, 678, 53 S.Ct. 761, 764, 77 L.Ed. 1439; Reinecke v. Smith, 289 U.S. 172, 177, 53 S.Ct. 570, 572, 77 L.Ed. 1109. We must hold that, in every real and practical sense, these instruments gave power to the petitioners to distribute or not distribute to themselves these capital gains in the tax year 1929. Having such power, they had a "discretion" so to do within the meaning of section 167.

In considering these cases, we have not overlooked the contention of respondent that the evidence makes no showing as to the needs of the beneficiaries during 1929 and, therefore, the factual setting for application of the rule of law as to the discretion of trustees (above urged by petitioners) is not present. This is true, but we have preferred to pass that matter by and to base our determination upon other grounds.

Also, we have considered the decisions cited by counsel on either side, but they are not helpful or pertinent to our line of thought and decision above set forth. Petitioners mainly rely upon Helvering v. Bowen, 85 F.(2d) 926 (C.C.A.4), and Sawtell v. Commissioner, 82 F.(2d) 221 (C.C.A.1). The Bowen Case involved a trust instrument quite similar to these before us, but the opinion and discussion therein have no relation to what has influenced us in these cases. The Sawtell Case is entirely different. Also inapplicable are Greenough v. Commissioner, 74 F.(2d) 25, (C.C.A.1), and Kaplan v. Commissioner, 66 F.(2d) 401 (C.C.A.1), urged by respondent.

Nor have we overlooked the argument of petitioners that the trusts are still existent, unchanged. Section 167 is not concerned with what *is* done under a trust agreement but with what *might be* done thereunder. The controlling statutory consideration is the existence of the described "discretion," not the way in which that discretion is actually exercised.

The determination of the Board in each of these cases is affirmed and the petitions to review dismissed.